UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

KENNETH STEELMAN                    CIVIL ACTION NO. 15-cv-0239

VERSUS                              CHIEF JUDGE HICKS

BURL CAIN                           MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Kenneth Steelman ("Petitioner") was charged in Sabine Parish with aggravated rape and indecent behavior with a juvenile based on allegations that he molested his two stepdaughters. He was convicted of both counts after a bench trial, and his convictions were affirmed on direct appeal.[1] Petitioner now seeks federal habeas corpus relief on the grounds that the evidence—primarily the testimony of the two girls—was insufficient to support the convictions. He points to inconsistencies between their statements to an investigator and their trial testimony, alleged evidence of coaching, and other reasons to question their credibility. For the reasons that follow, it is recommended that the petition be denied.

---

[1] The separate but substantially similar appellate opinions were issued as to each count. The unpublished opinions are in the record at Tr. 304 and Tr. 314. They are also available at State v. Steelman, 2013 WL 1136666 and 2013 WL 1136669 (La. App. 3d Cir. 2013, writ denied, 125 So.3d 443 (La.)

**Relevant Trial Evidence**

Bridget and Tony Diener were married and had three children, a son and two daughters. Tony passed away around 2001. Bridget married Petitioner a few years later, and he joined her and her children as a family that lived together for several years before claims of abuse were made.

The claims arose after the younger daughter, A.D., confided in a friend that her stepfather had been molesting her. The friend reported this to her mother, who contacted Bridget. The girls were questioned by Bridget, Petitioner was kicked out of the house, and law enforcement got involved. When the girls were questioned, they stated that Bridget and Petitioner were getting a divorce. Bridget, who had already been suffering from colon cancer before the molestation came to light, died before trial.

Deputy Sheriff Jason Rivers testified at trial that the two girls were taken to the Rapides Children's Advocacy Center in Alexandria for recorded interviews (that were played as evidence at trial). Both girls accused Petitioner of molesting them. Afterward, Petitioner was invited to the Sheriff's Office for an interview. Rivers said that, before the deputies could explain what they were going to do and administer <u>Miranda</u> warnings, Petitioner "immediately started telling us that he had information that the children were molested by their uncle." The deputies stopped him, explained his <u>Miranda</u> rights, and continued the interview. Petitioner soon asked for an attorney, which ended the interview.

Defense counsel asked Deputy Rivers if he investigated the complaint against the uncle. Rivers said that he spoke to the man by telephone and interviewed some family members, but he did not record the interviews. There is no indication that Petitioner or

anyone else had previously reported to law enforcement that the uncle was molesting the children.

A.D. was 10 years old when she was interviewed at the Advocacy Center in 2010. She said that her father had died when she was so young that she "didn't even get to meet him." Her mother married Petitioner when she was about five years old, and she said the abuse started after the marriage. She said it would happen when her mother was gone, such as when she took another child to a ball game. She said Petitioner would use his hands and a "boy's lower area" to touch her. She said he touched her "boobs" and "cookie," licked her cookie "a lot" and twice tried to penetrate her. A.D. said that Petitioner would try to take off her clothes "most of the time, but most of the time I wouldn't let him." The examiner asked her if anything "ever came out of his thing," and A.D. said there was "some, like white stuff."

A.D. was asked if she thought Petitioner did anything to P.D., her older sister. A.D. answered:

> A.D.      I know that he tried, like she told me like my momma told her like to get her story straight when we got up here. But like before we left the house we were just talking about what we was gonna say. And she said that he touched her boobs and that was it.

The examiner followed up in this exchange:

> Examiner:      Oh, excuse me. Well and tell me more about that. You said that your mom like was telling y'all to make sure you had your stories straight before y'all came up here?
>
> A.D.      Yeah like to tell the truth about what happened.

A.D. also said that she was once outside playing ball while P.D. played on a trampoline. Petitioner came outside, got on the trampoline and started "doing stuff" with P.D. A.D. said that she looked over "and he started touching her boobs."

    A.D. also testified live at the trial. She was then 12 and in the sixth grade. She described how Petitioner would touch her with his hands and penis on her breasts and "bad spot." She said he touched her with her clothes on and under her clothes. When asked how often, she agreed that it had been more than five times, with touching underneath her clothes more than twice. She again described how Petitioner attempted vaginal penetration and once ejaculated. A.D. said she did not tell her mother about the abuse because her mother was already sick and in a lot of stress that A.D. did not want to make worse.

    On cross-examination, A.D. was asked if she and her sister got together with her mother before the interview at the Advocacy Center, and whether her mother said she needed to "get her story straight." A.D. agreed with that. When asked, she also agreed that they talked about what they were going to say during the interview. Defense counsel asked if, when they were talking, P.D. told her that Petitioner only touched her breasts. A.D. answered yes. She was also asked if her uncle ever touched her inappropriately, and she said yes.

    P.D. was 15 when she was interviewed at the Advocacy Center. She said that Petitioner had started "messing around with us" even before he married their mother. If they resisted, he would get mad and start calling them names like "the B word." P.D. said that she was probably about nine or 10 when it started, and Petitioner "would just start feeling on us, you know trying to mess with us." P.D. said her clothes would be on during

the touching incidents. When asked if there was ever a time when her clothes were not on, she said, "No, they were always on." When asked if he would touch on top of her clothes or underneath, she said, "Pretty much on top." When asked if he ever touched underneath her clothes, she said no.

P.D. was asked where specifically Petitioner touched her. She pointed to areas of her body and said her "boobs" and her "private." When asked what he used to touch her, she said, "He just use his hands." She was asked how often Petitioner touched her, and she said, "Not really that often, 'cause he'll do it like one time that day and wait maybe awhile or something like that." She said he also touched her sister, but when pressed for details she said, "I don't, I wasn't really around when he did it to her." She said she only knew that he molested her sister " 'cause she told momma and me. And I didn't know he'd do that to her … [a]s young as she is." P.D. said that the last time Petitioner touched her was about two months earlier, and her mother and Petitioner had separated about a month afterward.

P.D. also testified at trial. She was then 17 and in the 10th grade. She testified that Petitioner would touch her with his hands on her private area and it "would be on top sometimes and under the clothes." She said the touching was with his hands "and then he tried to use his penis one time." She said he touched her boobs "over and under" her clothes and that such incidents would happen "almost every day -- every day of the week."

She said that Petitioner tried to penetrate her with his penis one time, and her pants and underwear were removed during that incident. P.D. said that she had not told her mother because her mother was sick and under stress. Bridget eventually asked P.D.

(presumably after A.D.'s claim became known) about any abuse. P.D. testified that she admitted it then because Petitioner was no longer living with them.

The prosecutor asked P.D. if her mom ever told her what to say to the police or to the lady at the Advocacy Center. P.D. answered, "No, ma'am." She admitted that the girls did talk with their mother about what happened. On cross-examination, she was asked if her mother ever said for them to get their "stories straight," and P.D. said no. She was questioned about the conflict between her statement that was touched only on top of her clothes and the testimony that she was touched over and under her clothes. P.D. replied that her clothes would be "on and off." When asked how often Petitioner touched her improperly she said it would be "like three times." She admitted that she never saw her sister touched by Petitioner.

The defense called Karen Williams, a victim's advocate who was sitting in the courtroom when P.D. testified. Defense counsel asked her if she overheard a comment from a relative of the victims who was in the audience. Ms. Williams said she was not 100% sure what the woman said, but it could have been, "Say it, P.D." Williams acknowledged that she admonished the woman not to speak in court.

**Sufficiency of the Evidence**

    **A. Summary of the Argument**

Petitioner's initial federal petition stated that the grounds for the writ are that there was constitutionally insufficient evidence to support the convictions. The petition went on to outline the evidence that Petitioner contends shows that Bridget and her relatives coached the children, the investigators ignored evidence that the uncle molested the

children (which would explain how they were able to testify about sexual matters), there was a great deal of inconsistent testimony, and P.D.'s statement was deceptive because she referred to "we" when she had no knowledge of whether her sister was molested.

Petitioner also filed a memorandum that clarified that the habeas issue is sufficiency of the evidence. Petitioner argued within the context of that claim that it was unconstitutional for the State to present a case (1) without physical, medical or psychiatric evidence, (2) presenting contradictory and uncorroborated testimony, (3) without addressing the plausible alternative theory that an uncle molested the girls, and (4) without explaining obvious witness coaching and manipulation.

### B. Jackson Standard; Elements of the Crimes

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

Under Jackson, federal courts must look to state law for "the substantive elements of the criminal offense." Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012), quoting Jackson, 99 S.Ct. at 2792 n. 16. Aggravated rape is defined in La. R.S. 14:42 to include "a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because … the victim is under the age of thirteen

years." Indecent behavior with a juvenile is defined in La. R.S. 14:81(A) as "the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person: (1) Any lewd or lascivious act upon the person ... under the age of seventeen, where there is an age difference of greater than two years between the two persons...."

### C. State Court Decisions

The trial judge did not give any reasons for the verdicts. After closing arguments were completed, he cited the docket numbers of each case and stated that he was "going to find you guilty, sir, of" the two counts. Tr. 173. Petitioner filed a post-verdict motion for judgment of acquittal. After argument, the trial judge said, "I'm going to respectfully deny your motion and your objection as to my ruling is noted." Tr. 184.

The state appellate court set forth the applicable Jackson standard and reviewed the evidence in great detail. The court acknowledged the inconsistencies and other points made by the defense but concluded that, when the record was reviewed in the light most favorable to the prosecution, there was sufficient evidence to support the convictions.

### D. Section 2254(d) Burden

"[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." Cavazos v. Smith, 132 S. Ct. 2, 4 (2011). "The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. That is because habeas relief is not available on a claim of this kind that was adjudicated on the merits in the state court unless that adjudication resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d).

Thus a state-court decision rejecting a sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews, 132 S.Ct. 2148, 2152 (2012); Harrell v. Cain, 595 Fed. Appx. 439 (5th Cir. 2015). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos, 132 S.Ct. at 4.

**E. Analysis**

Petitioner's argument, although framed as attacks on various components of the prosecution's case, rests primarily on an argument that the two girls were not credible because of various inconsistencies between their statements to the investigator and their testimony at trial regarding where they were touched, how often abuse occurred, whether touching was over or under clothing, and the like. Petitioner points out that he and the girls' mother were going through a divorce and that there were indications of possible coaching by family members.

The Jackson standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 99 S.Ct. at 2789. Once a defendant has been found guilty, the factfinder's decision "is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable

to the prosecution." Id. (Emphasis in original). And "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 2793.

"[U]nder Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). "All credibility choices and conflicting inferences are to be resolved in favor of the verdict." Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005). And "in challenges to state convictions under 28 U.S.C. § 2254, only Jackson need be satisfied, even if state law would impose a more demanding standard of proof." Schrader v. Whitley, 904 F.2d 282, 284 (5th Cir.1990). See also Wilson v. Rader, 619 Fed. Appx. 369, 370 (5th Cir. 2015).

The trial judge heard all of the testimony and entered verdicts that, if the testimony of the two child witnesses is accepted, are supported by the evidence. The state appellate court then conducted a reasonable review of the record and determined under Jackson that the convictions must be affirmed. Reasonable judges could differ if—placed in the role of the factfinder—they were asked to assess the credibility of the girls. But that is not the role of the habeas court. It may assess only the reasonableness of the state court's decision when it applied the Jackson standard. This court cannot say that the appellate court's decision was an objectively unreasonable application of the Jackson standard to the facts in this case.

Petitioner argues that parts of the state court analysis are incorrect or even unsupported by the record. For example, the appellate court stated that "the trial court's

conclusion" that the family's focus on the declining health of Bridget, rather than on seeking medical or psychiatric care for the children, was reasonable. Petitioner points out that the trial court did not make any express findings of fact regarding this or any other matter; the judge simply pronounced Petitioner guilty. That appears to be true, but a federal habeas court reviews the state court's ultimate decision, not the written opinion explaining that decision. Higgins v. Cain, 720 F.3d 255, 261 (5th Cir. 2013), citing Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc). Section 2254(d) "compels federal courts to review for reasonableness the state court's ultimate decision, not every jot of its reasoning." Santellan v. Cockrell, 271 F.3d 190, 193–94 (5th Cir. 2001). Thus, the alleged misstatement in the appellate court's opinion is not grounds for relief.

Petitioner points to the lack of medical treatment as an indication of lack of credibility of the claims. Credibility was addressed above. Petitioner may also contend that medical or other corroborating evidence was needed. But physical evidence is not required for a conviction. Federal courts have upheld convictions even when based solely on the testimony of a single witness, and sometimes when the witness was a co-conspirator who had accepted a plea bargain. See U.S. v. Hartzog, 189 Fed. Appx. 340, 349 (5th Cir. 2006) and U.S. v. Bowen, 818 F.3d 179, 186 (5th Cir. 2016). Such testimony is sufficient unless it is "incredible," which means it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature. Bowen, citing U.S. v. Valdez, 453 F.3d 252, 257 (5th Cir. 2006). The witnesses here testified that they personally observed and experienced the events, so physical evidence was not mandated to support the convictions.

A district court applied the Jackson principles and denied habeas relief in a similar case. A stepfather was convicted of exposing himself to a 12-year-old child even though the child was the only witness, the defendant denied the claim in his testimony, and the defense speculated that the claim was fabricated to break up a marriage. The state court's decision to affirm the conviction was found to be consistent with Jackson and other Supreme Court precedent. Ashanti v. Cockrell, 2002 WL 2030721, *8 (N.D. Tex. 2002). The same result should apply in this case.

State courts are the principal forum for asserting constitutional challenges to state convictions. When the state court has denied a claim on the merits, federal habeas corpus relief is strictly limited by the provisions of 28 U.S.C. § 2254(d). The Supreme Court has stated that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable within the meaning of the statute. And it has emphasized that Section 2254(d) stops short of imposing a complete bar on federal relitigation of claims rejected in state court. The statute is not a substitute for ordinary error correction through appeal. It is available to guard against only extreme malfunctions in the state criminal justice system. Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011). This was not one of those extreme malfunctions. It was a case with debatable credibility choices, common in criminal cases, which were made by the factfinder and upheld on appeal. Habeas relief is not available.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of

the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

      THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of February, 2018.

Mark L. Hornsby
U.S. Magistrate Judge